J-S07024-26                    2026 PA Super 65

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                      :      PENNSYLVANIA
                                        :
              v.                        :
                                        :
                                        :
THERON ROBERTS                   :
                                        :
          Appellant          :      No. 141 MDA 2025

Appeal from the Judgment of Sentence Entered September 27, 2024
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0001047-2022

BEFORE:  BOWES, J., OLSON, J., and BENDER, P.J.E.

OPINION BY OLSON, J.:                    **FILED: MARCH 30, 2026**

Appellant, Theron Roberts, appeals from the judgment of sentence entered on September 27, 2024, as made final by the denial of Appellant's post-sentence motion on December 30, 2024.  We affirm.

The trial court ably summarized the underlying facts of this case:

> [Appellant] was employed as a band director at Crestwood Area High School when it was alleged that he inappropriately touched a 15-year-old student, K.F. [(hereinafter "the Victim")], who was then participating in the band playing the saxophone and clarinet.  When she was in 8th grade, [the Victim] had a class taught by [] Appellant where she was the only student.  [The Victim] testified that towards the middle of her 8th grade school year, it was during these one-on-one instructional sessions when [] Appellant began sitting close to her and repeatedly touched her thigh in a way that made her feel "very uncomfortable."  [The Victim] routinely pulled away from [] Appellant's unwanted touch but he persisted.
>
> In her 9th grade year, [] Appellant appointed [the Victim] to be the leader of the clarinet section in the marching band. Prior to their performances, band members routinely assisted one another in making sure that their uniform and kit looked

sharp. [Appellant] took these opportunities to personally adjust [the Victim's] uniform, his hands lingering over her breasts and her buttocks as he adjusted her sash and cape. . . .

[The Victim's] father died in February of her 9th grade year. She testified that [] Appellant unexpectedly attended her father's wake. On that occasion he leaned in and hugged [the Victim], commenting that he could hug her now because they were not in school. [The Victim] told the jury that this awkward exchange made her uncomfortable.

In the fall of 2019, [the Victim] began her sophomore year. In that year [] Appellant promoted her to the rank of drum major. This leadership role within the band placed her second only to [] Appellant in the band hierarchy. As drum major [the Victim] helped run practices and conducted the band during games. One day during her sophomore year as the band members filed out of the band room on their way to the practice field [] Appellant held her back from joining her classmates under the pretense of having to tell her something. While standing behind [the Victim] in an alcove outside the band room doors the Appellant grabbed her buttocks and then placing his hands on her shoulders told her [in a quiet voice] that "if you ever tell anyone, I will make your life hell." . . . When [] Appellant was placed on leave from his position as band director for Crestwood High School for an unrelated reason, [the Victim] summoned the courage to report to police what [] Appellant had been doing to her.

On June 6, 2022, [] Appellant was charged with . . . institutional sexual assault, corruption of minors, indecent assault of a person less than 16 years of age, indecent assault by forcible compulsion, and harassment.[1]

A jury trial commenced on June 25, 2024. The jury rendered its verdict on June 27, 2024, convicting [] Appellant of each of the offenses charged. . . .

---

[1] 18 Pa.C.S.A. §§ 3124.2(a), 6301(a)(1)(ii), 3126(a)(8), 3126(a)(2), and 2709(a)(1), respectively.

On July 9, 2024, [Appellant's] counsel filed a motion for a new trial which attached as exhibit "A" a newspaper article from the Times Leader dated June 27, 2024, under the headline, "Despite efforts to keep from view, jurors in ex-band director's trial see service dog." Relevantly, prior to the start of trial, counsel for both parties became aware that [the Victim] brought a service dog to court. Outside the presence of the jury, the parties agreed to take certain measures to minimize [the Victim's] interaction with the service animal in the presence of the jury. The Deputy Attorney General outlined on the record the parties' agreement regarding the service dog in the courtroom. The parties agreed that the service dog would be outside the courtroom when [the Victim] took the witness stand. Other steps intended to minimize what inference or distraction the dog's presence might create included an agreement the service dog was to be kept with [the Victim's] mother who herself would be seated inside the courtroom in an area least visible from the jury box. In the courtroom these prophylactic measures were observed and there was no issue with the service dog in the courtroom.

. . . On August 21, 2024, [the trial court] conducted a hearing to address the issues presented by [] Appellant's motion for a new trial. The journalist who authored the newspaper article appended to [] Appellant's motion testified at that proceeding. Security video from the courthouse from June 27, 2024, was also admitted as defense exhibit #1. After reviewing the evidence, relevant case law, and the arguments of counsel, [the trial court] denied [] Appellant's motion for a new trial.

Trial Court Opinion, 5/14/25, at 1-4 (citations, footnotes, and some capitalization omitted).

On September 27, 2024, the trial court sentenced Appellant to serve an aggregate term of six to 23 ½ months in jail, followed by three years of probation, for his convictions. Following the denial of Appellant's

J-S07024-26

post-sentence motion, Appellant filed a timely notice of appeal.  He raises the following claim on appeal:

> 1. Did the trial court err as a matter of law or abuse its discretion in failing to award [Appellant] a new trial where, contrary to its instructions or order – where the service dog was to be in possession of the [Victim's] mother at all times and the jurors were not to view the service dog with the [Victim] – at least two jurors were exposed to and saw the [Victim] with her service dog when leaving the courthouse, all of which improperly led those jurors to infer that the [Victim] was suffering from mental anguish or effect as a result of the [] assaults, garner sympathy for the [Victim], and thereby deprived [Appellant] of due process and a fair trial?
>
>> a. Was [Appellant] deprived of due process and a fair trial where the [trial court] issued instructions or an order to ensure that the jurors did not see the [Victim's] service dog, which was present at the request of the Commonwealth, and the Commonwealth failed to abide by those instructions and failed to fulfill the duties and obligations imposed by that order, which inevitably resulted in the service dog being viewed by the jury, thereby improperly leading those jurors to infer that the [Victim] was suffering from mental anguish or effect as a result of the [] assaults, garner sympathy for the [Victim]?

Appellant's Brief at 2.[2]

Appellant claims that the trial court erred when it denied his motion for a new trial.  "[W]hen ruling upon a motion for a new trial, the [trial] court's inquiry asks specifically whether the asserted basis for relief entitles the

_____

[2] On March 5, 2026, Appellant filed an Application for Leave to File Reply Brief After Submission.  The application is granted and the Reply Brief filed contemporaneously with the application is deemed timely and was considered by the panel.

- 4 -

movant to a new trial." ***Commonwealth v. Wardlaw***, 249 A.3d 937, 948 (Pa. 2021). "The purpose of a motion for a new trial following a verdict of guilt is to bring before the trial court defects in the prior proceedings or after-discovered evidence which require that the verdict be set aside and a new trial granted" 16B WEST'S PENNSYLVANIA PRACTICE, CRIMINAL PRACTICE § 30:1. Moreover, "[a] trial court has an immemorial right to grant a new trial, whenever, in its opinion, the justice of the particular case so requires." ***Commonwealth v. Powell***, 590 A.2d 1240, 1242 (Pa. 1991) (quotation marks omitted). Our Supreme Court has held:

> It is the trial judge's review of the conditions and activity surrounding the trial which leaves him or her in the best position to make determinations regarding the fairness of the process and its outcome. It is apparent, therefore, if a trial court determines that the process has been unfair or prejudicial, even where the prejudice arises from actions of the court, it may, in the exercise of its discretionary powers, grant a new trial "in the interest of justice."

***Id.*** at 1243.

"Our [standard] of review in considering an order granting [or denying] a new trial is limited. Even though the evidence in the record may be conflicting, the law is well-settled that a grant or denial of a motion for a new trial will not be reversed unless there has been a clear abuse of discretion or an error of law." ***Commonwealth v. Morales***, 326 A.2d 331, 332 (Pa. 1974). The Pennsylvania Supreme Court has explained:

> the term discretion imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of

giving effect to the will of the trial judge. Absent an abuse of that discretion, an appellate court should not disturb a trial court's discretionary ruling. An appellate court will not find an abuse of discretion based on a mere error of judgment, but rather [discretion is abused] where the trial court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

Importantly, an appellate court should not find that a trial court abused its discretion merely because the appellate court disagrees with the trial court's conclusion. Indeed, when reviewing the trial court's exercise of discretion, it is improper for an appellate court to step into the shoes of the trial judge and review the evidence *de novo*. In other words, an appellate court may not disturb a trial court's discretionary ruling by substituting its own judgment for that of the trial court.

***Commonwealth v. DiStefano***, 265 A.3d 290, 297-298 (Pa. 2021) (quotation marks, citations, and brackets omitted).

Appellant claims that the trial court abused its discretion when it denied his motion for a new trial "when, after trial, it was discovered that at least two jurors saw [the Victim] with [her] service dog before they began deliberation." Appellant's Brief at 25.

Prior to trial, Appellant and the Commonwealth met with the trial court in chambers, to discuss their agreement regarding the presence of the Victim's service dog:

> [The Commonwealth]: The [Victim] does have a service dog present with her. We discussed in chambers how to make this most discrete, and we came up with the following agreements in order to do so.
>
> One, the service dog will not be up at the witness stand with [the Victim] as she testifies. When [the Victim] testifies, we will have the dog out in the hallway with [the Victim's] mom.

- 6 -

> Two, the dog will also be with [the Victim's] mom at all times. So even when the service dog is with [the Victim], her mom will also be present. That way, there is no inference that the dog must be [the Victim's]. It's just left open for interpretation as to whose [dog it] is.
>
> Three, the dog, [the Victim's] mom, and [the Victim] when in the courtroom will be seated prior to the jurors coming in, when possible, Judge. And we will make sure they're not in the front, that they're in a more discrete area so that the dog is not presenting any distraction throughout the trial.
>
> . . .
>
> [Appellant's Counsel]: Your Honor, I'm sure you understand our concern here, that concern being that some inference may be drawn by the jurors from the service dog. That's our concern. I just want to try to protect everything to make sure there are no issues, Your Honor. But that is my concern that there could be some inference drawn by the presence of the dog.
>
> [Trial Court]: Okay. And I understand the concerns, and I think that's why we're taking these cautionary steps to limit the jury's exposure to that. Obviously, the service dog is not necessary as was articulated for the testimony of the [Victim] and would only be with the [Victim] while she's completed her testimony and is just in the gallery of the courtroom observing the remainder of the trial.

N.T. Trial, 6/26/24, at 2-4.

As the trial court noted, "the [service] dog did not accompany the [Victim] onto the witness stand" and, "[i]n the courtroom[, the agreed-upon] prophylactic measures were observed and there was no issue with the service dog in the courtroom." Trial Court Opinion, 5/14/25, at 4 and 6. The jury then rendered its verdict on June 27, 2024, finding Appellant guilty of the above-summarized crimes.

On June 27, 2024, the Times Leader newspaper published an article titled "Despite efforts to keep from view, jurors in ex-band director's trial see service dog" (hereinafter "Newspaper Article"). The article was written by reporter Ed Lewis and states, in relevant part:

> despite efforts to keep the jury from seeing the [Victim's] service dog, several jurors exited the courthouse with the canine. . . . [E]fforts were made to keep the jury from observing the [Victim's] service dog that has been in the courtroom. Several jurors exited the courthouse for lunch just before 12 p.m. Thursday at the same time the girl and her service dog exited the courthouse.

Newspaper Article, 6/27/24, at 1-2.

On July 9, 2024, Appellant filed a post-trial motion, seeking a new trial because "the measures set forth by the [trial court] regarding [the service] dog were apparently not followed in that, despite the [trial court's] efforts to keep the jurors from seeing the dog, the witness and her service dog exited the courthouse for a lunch break on June 27, 2024 at the same time that several jurors exited the courthouse for lunch." Appellant's Post-Trial Motion, 7/9/24, at ¶ 30.

On August 21, 2024, the trial court held a hearing on Appellant's post-trial motion, where the trial court heard testimony from reporter Ed Lewis and viewed security video footage of the incident.

Mr. Lewis testified that, at around noon on June 27, 2024, he was exiting the courthouse and the Victim was "a few people in front of me, [also] exiting the courthouse." N.T. Hearing, 8/21/24, at 11. Mr. Lewis testified

that the Victim "had control of [her service] dog. . . . She was holding the leash." *Id.* at 11. He testified that he "distinctly remember[ed] seeing two" jurors who were empaneled on Appellant's trial in the "area of the exit to the courthouse during that time." *Id.* at 12. As he testified:

> A: [The Victim] with the service dog was exiting the courthouse. That was controlled by the rope line. It's very narrow. Only one person can walk through there. She was walking out. And there was a juror right behind her, the youngest juror.
>
> Q: While she was – while she was walking out, was she still holding the dog?
>
> A: Yes.
>
> Q: By the leash, of course?
>
> A: By the leash.
>
> . . .
>
> Q: Were the dog and [the Victim] within the view of, at least, two jurors while the [Victim was] holding the dog on the leash?
>
> A: The jurors that I saw were behind her. So it was hard not to see her and the service dog.

*Id.* at 12-14.

At the conclusion of the hearing, the trial court denied Appellant's motion for a new trial. *Id.* at 36. Appellant now claims that the trial court abused its discretion when it denied his motion for a new trial, as he "was deprived of an impartial jury and a fair trial because the jurors were exposed to [the] service [dog in the control of the Victim], which more probable than

- 9 -

not influenced their deliberation and the outcome of the present matter." ***See*** Appellant's Brief at 22. This claim fails.

"The impartiality and integrity of the jury are critical to the proper functioning of our judicial system." ***Commonwealth v. Jeter***, 296 A.3d 1187, 1199 (Pa. Super. 2023) (quotation marks and citations omitted); ***see also Dietz v. Bouldin***, 579 U.S. 40, 48 (2016) ("the guarantee of an impartial jury [] is vital to the fair administration of justice"). "Loss of impartiality may result from a juror's receipt of information about the case that was not part of the evidence received at trial." ***People v. Mora***, 420 P.3d 902, 932 (Cal. 2018); ***see also Commonwealth v. McCullough***, 201 A.3d 221, 243 (Pa. Super. 2018) ("[a factfinder] may not consider evidence outside of the record in making its determination. Nor may this Court uphold a trial court's order on the basis of off-the-record facts"). "A jury must be 'capable and willing to decide the case solely on the evidence before it,' lest a due process violation occur." ***Mora***, 420 P.3d at 932, *quoting* ***Smith v. Phillips***, 455 U.S. 209, 217 (1982); ***see also McCullough***, 201 A.3d at 243-244 ("a jury [may] not undermine a defendant's due process rights to a fair and impartial trial by forming opinions about the defendant's guilt or innocence by obtaining information outside of the record").

In ***Pratt v. St. Christopher's Hospital***, 866 A.2d 313 (Pa. 2005), the Pennsylvania Supreme Court held that, to measure the prejudicial impact of any extraneous information or outside influence upon a juror, a trial court must apply an "objective test for prejudice as well as the associated guidelines

that [were] set forth in the lead opinion in" ***Carter by Carter v. U.S. Steel Corp.***, 604 A.2d 1010, 1016-1017 (Pa. 1992) (plurality). ***Pratt***, 866 A.2d at 324; ***see also Jeter***, 296 A.3d at 1195. In ***Carter***, the Supreme Court declared:

> Once the existence of a potentially prejudicial extraneous influence has been established by competent testimony, the trial judge must assess the prejudicial effect of such influence. Because a trial judge is precluded from considering evidence concerning the subjective impact of an extraneous influence on any juror,[3] it has been widely recognized that the test for determining the prejudicial effect of an extraneous influence is an objective one. **In order to determine whether an extraneous influence is prejudicial, a trial judge must determine how an objective, typical juror would be affected by such an influence**. In addition, cases from other jurisdictions which have considered the prejudicial effect of an extraneous influence, make clear that **prejudice is to be determined in light of the facts and circumstances in each case**. Where the precise extraneous matter is known but direct evidence as to its effect on the deliberations is not permitted, a sound balance is struck by a rule which looks to the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case.
>
> . . .
>
> We begin our consideration of the proper standard of prejudice by examining the analogous situation involving an

---

[3] ***See Commonwealth v. Messersmith***, 860 A.2d 1078, 1085 (Pa. Super. 2004) ("[u]nder the exception to the no impeachment rule [contained in Pennsylvania Rule of Evidence 606(b)], a juror may testify only as to the existence of the outside influence, but not as to the effect this outside influence may have had on deliberations. Under no circumstances may jurors testify about their subjective reasoning processes . . . [and] a trial judge may not consider evidence regarding the subjective impact of an extraneous influence on any juror") (quotation marks and citations omitted).

*ex parte* communication between a judge and jury, a situation which, like an extraneous influence, implicates the impartiality and integrity of the jury. In **Commonwealth v. Bradley**, 459 A.2d 733 (Pa. 1983), [the Pennsylvania Supreme] Court adopted a rule to be applied in both civil and criminal cases where a party seeks to have the verdict set aside on the basis of an *ex parte* communication between a judge and jury. **A new trial will be granted in such cases only where there is a reasonable likelihood of prejudice**. Given the similar concerns inherent in *ex parte* communications and extraneous influences, such a standard is appropriate whenever the existence of an extraneous influence has been established by competent evidence, and we now adopt this standard for all such cases, with the understanding that the burden of proof is upon the moving party. In determining the reasonable likelihood of prejudice, the trial judge should consider 1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; 2) whether the extraneous influence provided the jury with information they did not have before them at trial; and 3) whether the extraneous influence was emotional or inflammatory in nature.

**Carter**, 604 A.2d at 1016-1017 (quotation marks, corrections, footnotes, and some citations omitted) (emphasis added); **see also Jeter**, 296 A.3d at 1195-1196.

In the case at bar, the trial court held a hearing on Appellant's claim of extraneous influence, where it heard testimony from reporter Ed Lewis (the individual who witnessed the alleged extraneous influence on the jurors) and viewed security video footage of the incident regarding the Victim's service dog. At the conclusion of the hearing, the trial court denied Appellant's motion for a new trial. As the trial court reasoned, the agreed-upon rules regarding the service dog – particularly the rules "directing that the service dog always remain with the [Victim's] mother" – were in place to "create[] ambiguity as

to who the dog was there for." Trial Court Opinion, 5/14/25, at 6. After hearing the testimony of Ed Lewis and viewing the security footage of the incident, the trial court arrived at the factual conclusion that "the [jurors'] view of the dog was incidental and fleeting and that the designed ambiguity was not so diminished as to have any effect on the one or two jurors present," especially since the Victim's mother was "present, if not directly aside, [the Victim during the incident] as [the Victim] held the dog's leash." *Id.* at 7-8.

The trial court's factual conclusions are supported by the record and binding on this Court. Further, we conclude that the trial court did not abuse its discretion when it denied Appellant's motion for a new trial, as the facts and circumstances of this incident did not create a reasonable likelihood of prejudice in a typical, objective juror. Here, "the [jurors'] view of the [service dog in the control of the Victim] was incidental and fleeting" and, since the Victim's mother was "present, if not directly aside" the Victim during the incident, the "designed ambiguity" regarding the ownership of the service dog was preserved. *See id.* at 6-8. Appellant's claim to the contrary thus fails.

Judgment of sentence affirmed. Application to File Reply Brief granted. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 03/30/2026